FILED20 OCT '11 15:17USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DCIPA, LLC, an Oregon                        Civil No. 10-6131-AA
domestic limited liability                   OPINION AND ORDER
company;

        Plaintiff,

    v.

LUCILE SLATER PACKARD
CHILDREN'S HOSPITAL AT
STANFORD;

        Defendant.

_____

Wm. Randolph Turnbow
Judith A. Giers
800 Willamette St., Suite 750
Eugene, Oregon 97401
    Attorneys for plaintiff

Randall P. Sutton
Saalfeld Griggs PC
P.O. Box 470
Salem, Oregon 97307

Page 1 - OPINION AND ORDER

Kathryn Doi
Stephen M. Lerner
Murphy Austin Adams Schoenfeld LLP
304 S Street
Sacramento, California 95811
    Attorneys for defendant

AIKEN, Chief Judge:

Defendant and counter-claimant Lucile Slater Packard
Children's Hospital at Stanford moves for partial summary
judgment, pursuant to Fed. R. Civ. P. 56, on plaintiff's claim
for declaratory judgment and on its eighth counterclaim.

Plaintiff DCIPA, LLC filed a cross-motion for summary
judgment on its claim for declaratory judgment and on all of
defendant's affirmative defenses and counterclaims. For the
reasons set forth below, defendant's motion for partial summary
judgement is denied and plaintiff's motion for summary judgment
is granted.

## BACKGROUND

Plaintiff is an Oregon Medicaid managed care health plan.
Defendant is a California hospital. On June 20, 2009, a 13-year-
old member of plaintiff's health plan was transferred to
defendant's hospital for an urgent liver transplant evaluation
due to suspected liver failure. Plaintiff and defendant did not
have a provider agreement or other contract in place for the
payment of services at the time of the transfer.

On June 21, 2009, the patient was placed at top priority
status on the United Network of Organ Sharing wait list. On June
22, 2009, the transplant was authorized, on a form provided by
plaintiff, which stated "BY ACCEPTING THIS PRIOR AUTHORIZATION,
Page 2 - OPINION AND ORDER

YOU AGREE TO ACCEPT DMAP [Division of Medical Assistance Program]
RATES FOR SERVICES RENDERED" (capitals in original). On that
same day, defendant contacted plaintiff in an attempt to
negotiate a contract for services, suggesting that plaintiff
would pay sixty-percent of the total billed charges. Plaintiff
declined this offer.

On June 23 and 24, 2009, defendant performed a successful
liver transplant on the patient. On June 25, 2009, plaintiff
formally responded, via letter from its outside counsel, to
defendant's rate proposal. The letter explained that plaintiff
was required, by its contract with DMAP and by the Oregon
Administrative Rules, to pay at 80% of the Medicare rate in
accordance with OAR 410-120-1295. Plaintiff attached a copy of
its contract with DMAP to the letter and offered to enter into a
formal contract for services with payment set at 80% of the
Medicare rate. Defendant did not respond to this letter.

The patient remained at the hospital for post-surgery
related services until July 3, 2009. Defendant continued to
treat the patient for four months after the transplant,
performing a number of inpatient and outpatient services.
Plaintiff authorized each one of these services before they were
performed, using the same form that stated "BY ACCEPTING THIS
PRIOR AUTHORIZATION, YOU AGREE TO ACCEPT DMAP RATES FOR SERVICES
RENDERED" (capitals in original). Other than the authorization
form, no further communications were exchanged regarding the
payment rate for the services provided. The total billed charges

Page 3 - OPINION AND ORDER

for the transplant and related services provided by defendant
equaled $1,469,649.91.

Throughout the course of treatment, defendant sent bills to
plaintiff regarding these services. For each bill received,
plaintiff paid 80% of the Medicare rate. After the provision of
services concluded, defendant sent plaintiff several
"underpayment appeals," requesting that plaintiff pay sixty-
percent of its billed charges.

On May 27, 2010, plaintiff filed this action, seeking a
declaratory judgment that it had fulfilled its financial
obligation to defendant by paying $236,699.92, which represents
80% of the Medicare rate, for the disputed services. On April 5,
2011, defendant filed an amended answer, alleging six affirmative
defenses and eight counterclaims. Defendant requested, as
damages, that plaintiff pay the "reasonable value" of the billed
charges. The parties subsequently moved for summary judgment.

## STANDARD

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(a). Substantive law on an issue determines the materiality of
a fact. T.W. Electrical Serv., Inc. v. Pacific Electrical
Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987). Whether
the evidence is such that a reasonable jury could return a

Page 4 - OPINION AND ORDER

verdict for the nonmoving party determines the authenticity of a
dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).

The moving party has the burden of establishing the absence
of a genuine issue of material fact. Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986). If the moving party shows the absence
of a genuine issue of material fact, the nonmoving party must go
beyond the pleadings and identify facts which show a genuine
issue for trial. Id. at 324.

Special rules of construction apply when evaluating summary
judgment motion: (1) all reasonable doubts as to the existence of
genuine issues of material fact should be resolved against the
moving party; and (2) all inferences to be drawn from the
underlying facts must be viewed in the light most favorable to
the nonmoving party. T.W. Electrical, 809 F.2d at 630.

## DISCUSSION

The parties move for summary judgment on the application and
interpretation of certain provisions of Chapter 410 of the Oregon
Administrative rules, including OAR 410-120-1295, among other
issues. It is undisputed that the interpretation of Chapter 410
of the Oregon Administrative Rules and the provisions therein are
questions of law, to be interpreted by this Court.

I. Preliminary Matter

To support their cross-motions for summary judgment, the
parties request that this Court take judicial notice of certain
documents and regulations. Plaintiff seeks judicial notice of: a

Page 5 - OPINION AND ORDER

report, entitled "Impact of Rogers Amendment on Contracts between Participating Health Plans and Hospital and the Affect on Medi-Cal Managed Care Enrollees," by the California Medicaid authority, dated October 1, 2009; and an unpublished California Superior Court case, Molina Healthcare of CA Partner Plan v. Shewry, Case No. 34-2008-8000111 (April 3, 2009), which interprets 42 U.S.C. §§ 1396u-2.

Defendant requests judicial notice of: OAR §§ 410-120-0000, 410-120-1295, and 410-124-0000 through 410-124-0160 as they existed in 2009; current versions of Or. Rev. Stat. § 414.743 and 410-120-1295; 42 U.S.C. §§ 1396u-2, 1395dd; Oregon's Medicaid State Plan under Title XIX of the Social Security Act Medical Assistance Program; excerpts from the websites of DMAP, the U.S. Census Bureau, and OHSU's Oregon Office of Rural Health; a letter, dated March 31, 2006, from Dennis G. Smith, director of the Centers for Medicaid and State Operations ("CMS"); pages from the Oregon State Plan, including Attachment 3.1 relating to Transplant Services; HB 3624, Laws 2003, c. 810, § 12, eff. Oct. 1, 2003; written testimony of Lynn Read, Administrator, Health Services, Office of Medical Assistance Programs, dated April 23, 2003 concerning HB 3624; minutes of the 2003 House Committee on Audit & Human Services Budget Reform, April 28, 2003, 3:15 p.m.; copy of California Rules of Court, Rule 8.1115; Santa Ana Hospital Medical Center v. S. Kimberly Belshe, 56 Cal.App.4th 819, 65 Cal.Rptr.2d 754 (1997); and the Complaint and Civil Docket, filed in the Central District of California, for

Cal. Hosp. Ass'n v. David Maxwell-Jolly, Director of the Cal.
Dept. of Health Care Servs, Case No. 2:09-cv-03694-CAS-MAN (May
22, 2009).

Judicial notice may be taken at any stage in the
proceedings. Fed. R. Evid. 201(f). A judicially noticed fact
"must be one not subject to reasonable dispute in that it is
either (1) generally known within the territorial jurisdiction of
the trial court or (2) capable of accurate and ready
determination by resort to sources whose accuracy cannot
reasonably be questioned." Fed. R. Evid. 201(b). However,
taking judicial notice of certain documents does not demonstrate
the truth of everything contained in those records, and, as such,
the truthfulness and proper interpretation of the document are
disputable. See Ohio Bell Telephone Co. v. Public Utilities
Commission, 301 U.S. 292, 300-1 (1937).

The relevant facts in this case are largely undisputed.
Further, most of the documents that the parties seek judicial
notice of are statutes, administrative rules, or case law, which
are already part of the public record, and are therefore capable
of accurate and ready determination by resort to sources whose
accuracy cannot reasonably be questioned. I find that the
additional documents introduced by both plaintiff and defendant,
despite the parties' respective objections, are also not subject
to reasonable dispute. Accordingly, the parties' requests for
judicial notice are granted.

Page 7 - OPINION AND ORDER

## II.  Medical and Legal Background

Before analyzing the merits of the parties' cross-motions for partial summary judgment, this Court reviews the relevant medical and legal background.

### A.  Federal Medicaid Law

The Medicaid program, established by Title XIX of the Social Security Act, is a cooperative effort by the federal government and the states to provide medical care to persons "whose income and resources are insufficient to meet the costs of necessary medical services." Atkins v. Rivera, 477 U.S. 154, 156-7 (1986) (citing to 42 U.S.C. §§ 1396 et seq.).  The federal government shares the costs of Medicaid with states that voluntarily elect to participate in the program and, in return, participating states comply with the requirements of the Medicaid Act.  Id.; see 42 U.S.C. § 1396; see also Alaska Dept. of Health and Social Servs. v. Centers for Medicare and Medicaid Servs., 424 F.3d 931, 935 (9th Cir. 2005).

Each state administers its own Medicaid program through a single state agency, pursuant to a state Medicaid plan which must be reviewed and approved by the Secretary of Health and Human Services.  See 42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10 & 431.10; Alaska Dept. of Health, 424 F.3d at 935.  Payment of services are made directly by the state to the individuals or entities that furnish the services.  42 C.F.R. § 430.10.

Page 8 - OPINION AND ORDER

B. Oregon's State Medicaid Plan

Oregon's Medicaid program is known as the Oregon Health Plan ("OHP") and is primarily regulated by Chapter 410 of the Oregon Administrative Rules. The OHP is administered by DMAP, Oregon's state agency. Because the OHP was designed to stretch the limited Medicaid funds to provide as much care to as many people as possible, the Legislative Assembly gave DMAP great flexibility in setting the rates and amounts it would pay providers. See Or. Rev. Stat. § 414.065(1). Consistent with this policy, DMAP has generally paid very low rates to providers. The OHP Medicaid rates are usually expressed as a percentage of the Medicare rate for the relevant services.

The OHP has two primary plans: Fee-For-Service ("FFS") plans and Fully Capitated Health Plans ("FCHP"). The state assigns people eligible for benefits under the OHP to either plan. Under a FFS plan, beneficiaries are served directly by DMAP, through DMAP-approved "enrolled providers." A provider becomes "enrolled" in a FFS plan by contractually agreeing to all of the conditions of the program; as such, enrolled providers are required to know and follow all DMAP regulations. See OAR 410-120-1160(1). The enrolled provider bills DMAP directly and DMAP pays the providers according to a published fee schedule. See OAR 410-120-1340. Thus, as the name suggests, providers enrolled in the FFS program are paid a set fee by DMAP for each service provided.

Page 9 - OPINION AND ORDER

Under a FCHP, beneficiaries are served by managed care plans. Like FFS systems, FCHP systems contract with the state, through DMAP, to provide healthcare services. DMAP contracts require that FCHPs comply with the applicable laws and Oregon Administrative Rules ("OAR") when dealing with providers. The FCHP, however, does not directly bill DMAP for services; rather, the state pays each FCHP an actuarially determined amount per member each month. FCHPs are a subset of the broader segment of Prepaid Health Plans ("PHPs").

Under DMAP contracts and the OARs, FCHPs are required to enter into formal "provider agreements" with sufficient primary care and other providers, including at least one hospital, to ensure that all members have reasonable access to medical care. The providers who enter into provider agreements directly with the FCHP are called "participating providers." FCHPs try to refer members exclusively to participating providers. However, members occasionally require care from providers that have not entered into provider agreements. These providers are referred as "non-participating providers."

Plaintiff is a Medicaid managed health care plan under the OHP. It has a contract with DMAP for the provision of services under the FCHP program. Plaintiff's FCHP is owned and operated by most of the physicians in Douglas County and provides care to nearly 16,000 low income people. Because the parties did not have a provider agreement in place at the time services were

Page 10 - OPINION AND ORDER

rendered, defendant qualifies as a "non-participating provider" under the regulations.

In addition, defendant has a contract with DMAP for the provision of pediatric transplant services under the FFS program, and, as such, also qualifies as an enrolled provider. See LPCH-DMAP Contract, at pg. 6. Accordingly, for services provided to members of the OHP that are covered under the FFS program, defendant bills DMAP directly and DMAP pays the defendant according to the fee determined by their contract.

## C. Statutory, Regulatory and Contract Law Governing Reimbursement for Services

Oregon tightly regulates payments under its Medicaid plan through statute and administrative rule. The payment rate is determined by a number of factors, including the type of services provided (transplant, emergency, etc.), the type of plan involved (FFS or FCHP), the entity providing services (rural provider, hospital, etc.), and whether the provider is designated as "participating" or "non-participating."

It is undisputed that at least some of the services provided by defendant, including the transplant itself, constitute "emergency" services. See OAR 410-124-0040(1) (defining "emergency transplant" as "one in which medical appropriateness requires that a covered transplant be performed less than five days after determination of the need for a transplant"). It is

Page 11 - OPINION AND ORDER

also undisputed that defendant was qualified under the
regulations to provide such transplant services. See OAR 410-
124-0040(1). The regulations are not explicit regarding which
payment rate governs where, as here, both the transplant and non-
participating hospital provisions are implicated.

i. Payment Rate for Emergency and Non-Emergency
Transplant Services

Or. Rev. Stat. § 414.065, as implemented through OAR 410-
124-0000 and OAR 410-124-0040, governs payment for qualifying
emergency and non-emergency transplant services. See Or. Rev.
Stat. § 414.065.

Under OAR 410-124-0000, which governs general transplant
services, reimbursement by a FCHP for covered transplant services
and follow-up care "will be by agreement between the FCHP and the
transplant center." OAR 410-124-0000(9)(c). Under OAR 410-124-
0040, which governs emergency transplant services, "FCHPs will
make payment as described in their contract." OAR 410-124-
0040(2).

ii. Payment Rate for a FCHP to Non-Participating
Hospitals for Emergency and Non-Emergency Services

Or. Rev. Stat. § 414.743, as implemented through OAR 410-
120-1295, governs payments by a FCHP to non-participating
provider hospitals. See Or. Rev. Stat. § 414.743(1); see also OAR
410-141-0420(6)(D) ("The PHP shall be responsible for payment to

Page 12 - OPINION AND ORDER

non-participating providers . . . [in] the amount specified in
OAR 410-120-1295"). OAR 410-120-1295 specifies the reimbursement
rate, and reads in relevant part and time:

> (3) For covered services provided on and after January 1,
> 2008, the . . . FCHP that does not have a contract with a
> Hospital, is required to reimburse, and Hospitals are
> required to accept as payment in full, the following
> reimbursement:

> (b) The FCHP will reimburse inpatient and outpatient
> services [provided by] non-participating hospitals . . .
> based upon 80 percent of the Medicare rate. Emergency
> services must be consistent with 42 U.S.C. § 1396u-
> 2(b)(2)(D).

OAR 410-120-1295(3)(b).

> Section 1396u-2(b)(2)(D) states:

> Any provider of emergency services that does not have in
> effect a contract with a Medicaid managed care entity that
> established payment amounts for services furnished to a
> beneficiary enrolled in the entity's Medicaid managed care
> plan must accept as payment in full no more than the amounts
> . . . that it could collect if the beneficiary received
> medical assistance under this subchapter other than through
> enrollment in such an entity.

42 U.S.C. § 1396u-2(b)(2)(D).

        iii.   <u>Payment Rate for Emergency and Non-Emergency</u>

                <u>Services Required by Plaintiff's Contract with</u>

                <u>the State</u>

While not binding on defendant, plaintiff's contract with
DMAP requires it to pay non-participating providers in accordance
with OAR 410-120-1295: "[i]f a Non-Participating Provider is, or
becomes enrolled with DMAP, reimbursement of the Non-
Participating Provider is governed by DMAP General Rules

(Division 120)[of OAR Chapter 410]" and "[i]f the Emergency
Services Provider does not have a contract with [plaintiff],
[plaintiff] shall pay the Non-Participating Provider pursuant to
the Non-Participating Provider rule, 410-120-1295." DCIPA-DMAP
Contract, at pgs. 16 & 26.

III. Analysis

Plaintiff contends that the parties entered into a number of
implied contracts for the services provided. Plaintiff argues
that by performing services pursuant to its authorization form,
which stated "BY ACCEPTING THIS PRIOR AUTHORIZATION, YOU AGREE TO
ACCEPT DMAP RATES FOR SERVICES RENDERED," defendant agreed to
accept the rates set forth in plaintiff's contract with DMAP.
Plaintiff's DMAP contract specifies that payment to non-
participating providers for services administered to members of
plaintiff's FCHP, even if the non-participating provider is
otherwise enrolled with DMAP, must be in accordance with OAR 410-
120-1295. See DCIPA-DMAP Contract, at pgs. 16 & 26. Thus,
plaintiff argues that defendant impliedly agreed to accept
payment in accordance with OAR 410-120-1295.

Plaintiff interprets OAR 410-120-1295 as requiring payment
at 80% of the Medicare rate for all services provided. To the
extent that 42 U.S.C. § 1396u-2(b)(2)(D) is implicated, plaintiff
asserts that it establishes a ceiling, not a minimum, on the
amount of payment to a non-participating hospital. In the
alternative, plaintiff asserts that if the parties did not enter

Page 14 - OPINION AND ORDER

into a series of implied contracts, Or. Rev. Stat. § 414.743, as
implemented through OAR 410-120-1295, would still govern this
matter, in which case defendant would be entitled to payment at
80% of the Medicare rate.

Defendant disagrees that OAR 410-124-0000(9)(c) and OAR 410-
124-0040(2) govern this dispute, and that plaintiff violated
these provisions by refusing to negotiate a contract in good
faith. Defendant, however, contends that if the Court concludes
that OAR 410-120-1295 does apply, it requires plaintiff to pay
for services at the much higher FFS rate established in
defendant's contract with DMAP. Defendant's argument that
plaintiff must pay more than 80% of the Medicare rates for
"emergency services" is premised solely on the OAR 410-120-1295's
reference to 42 U.S.C. § 1396u-2(b)(2)(D).

Moreover, even if OAR 410-120-1295 is held to apply and is
interpreted in plaintiff's favor, defendant asserts that,
regardless, it is entitled to additional compensation because 1)
the 80% of the Medicare rate "was never approved by the federal
Center for Medicare and Medicaid Services to be part of the State
Plan and therefore cannot be implemented; 2) to the extent the
Oregon statute and regulation are not attempting to establish
'Medicaid rates,' they govern only payments to Oregon hospitals
and not defendant . . . ; and 3) since the contract between the
Oregon Medicaid agency . . . and [plaintiff] expressly states
that there are no third party beneficiaries, the converse is also

Page 15 - OPINION AND ORDER

true, and a third party such as [defendant], which cannot be considered a beneficiary to the contract cannot be subject to the burdens of the contract." Def.'s Reply to Mot. Part. Summ. J. 1-2.

Thus, the threshold issue is whether the parties formed a valid contract for payment at "DMAP rates" and if so, what that term entails. Because plaintiff's "DMAP rates" are calculated in accordance with OAR 410-120-1295, if the Court finds that a contract was formed, it must then determine whether defendant is required to accept 80% of the Medicare rate for the services provided; or, conversely, if plaintiff is required to pay the amount defendant could receive if the beneficiary was covered by defendant's FFS contract with DMAP. Finally, if OAR 410-120-1295 is interpreted in plaintiff's favor, the Court must ascertain whether 80% of the Medicare rate is otherwise inapplicable to defendant.

## A. Existence of Implied Contracts

The Court must first determine whether the parties entered into a contract for the payment of services. Plaintiff contends that defendant's conduct, including obtaining plaintiff's authorization form, filling in the parties' names and other material terms, faxing it to plaintiff for signature, and then actually performing transplant services after receiving plaintiff's signature, evidences the existence of an implied contract for plaintiff's "DMAP rates."

Page 16 - OPINION AND ORDER

Moreover, plaintiff argues that, after defendant received the letter from plaintiff's counsel sent on June 25, 2009, any potential ambiguity regarding the term "DMAP rates" was resolved. Plaintiff asserts that the letter explained that plaintiff's contract with DMAP required it to pay non-participating hospitals in accordance with OAR 410-120-1295, which plaintiff interpreted as requiring payment at 80% the Medicare rate. Because defendant continued to provide services for the next three months after the ambiguity was resolved, using the same authorization form without objection, plaintiff argues that at least these later contracts bound defendant to accept plaintiff's "DMAP rates."

Defendant's response to plaintiff's assertion of an implied contract for "DMAP rates" is notable. Defendant does not dispute the circumstances surrounding the authorization of the transplant and related services. Rather, defendant contends that it interpreted the term "DMAP rates" to signify the rate set out in its own FFS contract with DMAP. Because the parties each attached a different meaning to the term "DMAP rates," defendant argues that no contract was formed since "there was no meeting of the minds with respect to the key term of the applicable payment rate." Def.'s Reply to Mot. Part. Summ. J. 1. At the same time, however, defendant asserts that the parties did, in fact, have an implied contract and that the terms of that contract require plaintiff to pay either the "reasonable value" for the services provided or the FFS rate set in its contract with DMAP. See

Page 17 - OPINION AND ORDER

Def.'s Am. Answer, Affirm. Defenses & Countercls. 11; Def.'s Response to Plf.'s Mot. Summ. J. 1.

In support of its argument that no contract exists, defendant relies on Phillips, in which the Oregon Supreme Court stated, "before there can be a valid contract there must be a meeting of the minds to all its terms; that nothing can be left for future negotiation, and that if any portion of the contract is not agreed upon, or if no method is agreed upon which such a term or provision can be settled, there is no contract." Phillips v. Johnson, 266 Or. 544, 555, 514 P.2d 1337 (1973).

Whether a contract exists is a question of law. Ken Hood Constr. v. Pacific Coast Constr., 201 Or. App. 568, 577, 120 P.3d 6 (2005), adh'd to as modified on recons., 203 Or. App. 768, 126 P.3d 1254 (2006). The term "implied contract" can refer either to a contract implied-in-fact or to one implied-in-law. See Jaqua v. Nike, Inc., 125 Or. App. 294, 297-98, 865 P.2d 442 (1993). Here, plaintiff is alleging the existence of an implied-in-fact contract. The only difference between an express and implied-in-fact contract is the way in which they are formed: in an express contract, the parties manifest agreement through words, whether written or spoken, whereas in an implied-in-fact contract, the parties' agreement is inferred from their conduct. Staley v. Taylor, 165 Or. App. 256, 262, 994 P.2d 1220 (2000) ("implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties

Page 18 - OPINION AND ORDER

understood that their acts were sufficient to manifest an agreement"). As such, an implied-in-fact contract has the same legal effect as an express contract. Id.

Defendant contends that there can be no contract, express or implied, where there in no "meeting of the minds." The term "meeting of the minds" is "'a much abused metaphor,'" and requires only that there be mutual assent to the terms of the agreement. State v. Heisser, 350 Or. 12, 24, 249 P.3d 113 (2011) (citing Bennett v. Farmers Ins. Co., 332 Or. 138, 148, 26 P.3d 785 (2001)(noting that mutual assent "historically was considered as the 'meeting of the minds' requirement")). Thus, an enforceable contract does not necessarily require a "meeting of the minds," as long as the parties' intent to enter into a contract can be shown through words or conduct. Id. (citing to Corbin on Contracts § 4.13, at 636).

In Kitzke, the Oregon Supreme Court expressly rejected defendant's position that the term "meeting of the minds" required "each of the two parties . . . to have in mind the same idea and intent before the jury could find that they effected a contract." Kitzke v. Turnidge, 209 Or. 563, 572-73, 307 P.2d 522 (1957). Rather, the court held that "[t]he law of contracts is not concerned with the parties' undisclosed intents and ideas. It gives heed only to their communications and overt acts." Id. at 573. Thus, whether the parties entered "into a contract does not depend on their uncommunicated subjective understanding; rather,

Page 19 - OPINION AND ORDER

it depends on whether the parties manifest assent to the same express terms." Newton/Boldt v. Newton, 192 Or. App. 386, 392, 86 P.3d 49 (2004) (internal citation omitted); see also Kitzke, 209 Or. at 572-73 ("'[a]greement consists of mutual expressions; it does not consist of harmonious intentions or states of mind.'" (quoting Corbin on Contracts § 19)).

Here, the parties' communications and overt actions clearly manifested an objective intent that defendant would provide the relevant services and plaintiff would pay for them at "DMAP rates." Thus, the fact that the parties' may have subjectively attributed different meanings to the term "DMAP rates" is immaterial in regard to whether an enforceable contract was formed. See Heisser, 350 Or. at 25. Because the parties' expressed mutual assent through conduct, an enforceable contract was formed.

Further, defendant's reliance on Phillips is misplaced. Phillips involved a land sale contract, wherein the agreement did not provide whether the sale was to be consummated by deed, note and mortgage, or by land sale contract. Phillips, 266 Or. at 555. Phillips held that the indefiniteness rendered the agreement unenforceable. Id. at 557. Thus, Phillips involved an express contract with missing material terms, the absence of which made the contract impossible to perform or enforce. Conversely, here, the contract contains all of the material terms, although the meaning of a contractual term is disputed.

Page 20 - OPINION AND ORDER

As such, Phillips is distinguishable from this case. Moreover, the holding in Phillips has been limited to actions for specific performance of contracts for the sale of land. See Earls v. Corning, 207 Or. App. 706, 712, 143 P.3d 243 (2006). Accordingly, the language that defendant relies on in Phillips is inapplicable here. Therefore, having concluded that the parties entered into an enforceable agreement, the terms of that agreement must now be determined.

Whether a contract is ambiguous is a question of law. Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997). A contract provision is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is capable of more than one plausible and reasonable interpretation. Batzer Constr., Inc. v. Boyer, 204 Or. App. 309, 313, 129 P.3d 773, rev. den., 341 Or. 366, 143 P.3d 239 (2006). Generally, disposition of a contract dispute as a matter of law is not appropriate unless the meaning of the disputed provisions "is so clear as to preclude doubt by a reasonable person." Deerfield Commodities v. Nerco, Inc., 72 Or. App. 305, 317, 696 P.2d 1096, rev. den., 299 Or. 314, 702 P.2d 1111 (1985).

Plaintiff argues that the term "DMAP rates" is unambiguous and can only refer to the rates contained in plaintiff's contract with DMAP. Defendant asserts that it "was led to believe the phrase ["DMAP rates"] in [plaintiff's] authorization forms

Page 21 - OPINION AND ORDER

referred to [defendant's] rates with DMAP since [it] had a
contract with DMAP." Turnbow Decl., Ex. 6; Def.'s Resp. to
Renumbered Interrog. No. 41. While the "threshold to show
ambiguity is not high," I find the term "DMAP rates" is
unambiguous and can only be reasonably interpreted to refer to
plaintiff's DMAP rates. Milne v. Milne Constr. Co., 207 Or. App.
382, 388, 142 P.3d 475, rev. den., 342 Or. 253, 149 P.3d 1212
(2006). The interpretation of the phrase proffered by defendant
is unreasonable and implausible for at least three reasons.

First, the plain language of the authorization form itself
makes clear that the term "DMAP rates" references plaintiff's
DMAP rates. Plaintiff's form states that "BY ACCEPTING THIS
PRIOR AUTHORIZATION, YOU AGREE TO ACCEPT DMAP RATES FOR SERVICES
RENDERED" (capitals in original). This is a standard form used
with all providers, regardless of whether the party providing the
services also has a contract with DMAP. Given this practice and
the plain language of the form, it would be illogical for the
phrase "DMAP rates" to apply to anything other those rates
contained in plaintiff's contract with DMAP.

Second, and more importantly, plaintiff did not know, and
could not have known, the rate specified in defendant's FFS
contract with DMAP, especially since that rate is not publicly
available. As such, its inconceivable that plaintiff would have
drafted its authorization form, long before this dispute, to
incorporate by reference some secret rate contained in

Page 22 - OPINION AND ORDER

defendant's contract with DMAP.

Third, defendant continued to provide transplant related services pursuant to plaintiff's authorization form, without objection or any attempt to further negotiate a contract for the payment of services, even after plaintiff's counsel explained that "DMAP rates" meant payment of 80% of the Medicare rate, in accordance with OAR 410-120-1295. This fact, in and of itself, does not bear directly on the issue of the proper interpretation of the term "DMAP rates." However, it does establish, at least in regard to services provided after the alleged ambiguity was resolved, that defendant is bound by plaintiff's DMAP rates.

Thus, while defendant advocates an alternative interpretation of the phrase "DMAP rates," this interpretation is not objectively reasonable or plausible in light of the terms of the authorization form or the circumstances surrounding the formation of the contract as discussed above. See Batzer Constr., 204 Or. App. at 313.

Finally, while not explicitly plead as a defense, defendant suggests that, even if a contract was formed, the employees who solicited and accepted the authorizations did not have actual authority to bind defendant, and thus, defendant is not required to accept "DMAP rates." See Milligan Decl., Ex. 5, Def.'s Resp. to Plf.'s Mot. Summ. J. Regardless of any defects in pleading, this defense must be rejected because those employees at least had apparent authority to bind defendant. See Taylor v.

Page 23 - OPINION AND ORDER

Ramsay-Gerding Constr. Co., 345 Or. 403, 410, 196 P.3d 532 (2008)
(principal may be bound to a third-party for an act of an agent
completely outside the agent's implied or express authority if
the principal permits the agent to appear to have the authority
to bind the principal).

Accordingly, I find that, as a matter of law, the parties
formed implied contracts for the payment of services rendered at
the rate set out in plaintiff's contract with DMAP. However,
because plaintiff's contract with DMAP does not explicitly state
the rate of payment, but rather incorporates the rates by
reference to OAR 410-120-1295, it must still be determined what
rate of payment OAR 410-120-1295 requires for the provision of
emergency services.

## B. Interpretation of OAR 410-120-1295

When construing a statute, the court first looks at the
plain language of the statute, including text and context, which
offer the best evidence of the legislature's intent. In re
Marriage of Polacek, 349 Or. 278, 284, 243 P.3d 1190 (2010)
(citing State v. Gaines, 346 Or. 160, 171, 206 P.3d 1042 (2009));
see also Rodriguez v. Holder Jr., 619 F.3d 1077, 1079 (9th Cir.
2010). When the statute's language is plain, "the sole function
of the courts - at least where the disposition required by the
text is not absurd - is to enforce it according to its terms."
Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004)(internal
quotation marks omitted); see also Bergerson v. Salem-Keizer

Page 24 - OPINION AND ORDER

School Dist., 341 Or. 401, 413, 144 P.3d 918 (2006).

I find no case law or legislative history discussing or interpreting Or. Rev. Stat. § 414.743, OAR 410-120-1295, or 42 U.S.C. § 1396u-2(b)(2)(D). Regardless, while the administrative rule at issue may be poorly drafted, its plain language is clear. The rule explicitly applies to all "covered services provided on and after January 1, 2008," including both emergency and non-emergency services. Under the parties' implied contract for "DMAP rates," non-emergency inpatient and outpatient services are to be reimbursed at "80 percent of the Medicare rate." OAR 410-120-1295(30(b). In addition to the above requirement, the reimbursement for emergency services "must be consistent with 42 U.S.C. § 1396u-2(b)(2)(D)." Id.

Accordingly, under the express language of the regulation, payment for emergency services at 80% of the Medicare rate is appropriate as long as such payment is "consistent" with 42 U.S.C. § 1396u-2(b)(2)(D). The word "consistent" is defined as "being in agreement" or "conforming to the same principles," and in this context, clearly means "not contrary to." WEBSTER's II NEW RIVERSIDE UNIVERSITY DICTIONARY 301 (Anne H. Soukhanov et al eds., 2d ed. 1988).

Thus, OAR 410-120-1295(3)(b) requires plaintiff to pay 80% of the applicable Medicare rate for the services in dispute, unless the federal statute imposes a different, higher rate. Section 1396u-2(b)(2)(D), however, does not impose such a

Page 25 - OPINION AND ORDER

requirement. In fact, 42 U.S.C. § 1396u-2(b)(2)(D) does not even dictate what a FCHP must pay to a non-participating hospital; rather, the plain language of the federal statute makes clear that it was only intended to act as a limit on what a hospital may demand as payment. See 42 U.S.C. § 1396u-2(b)(2)(D) ("provider . . . must accept as payment in full *no more than* the amounts . . . that it could collect if the beneficiary received medical assistance . . . other than through enrollment in [a FCHP]" (emphasis added)).

Interpreting 42 U.S.C. § 1396u-2(b)(2)(D) in any other way would be antithetical to the plain language of the administrative rule and federal statute, and thus, incompatible with the legislative intent. Lamie, 540 U.S. at 534. Indeed, defendant's interpretation of 42 U.S.C. § 1396u-2(b)(2)(D) requires this Court to construe the phrase "no more than" as requiring a FCHP to pay "no less than" a hospital's much higher FFS rate. As such, the interpretation that defendant advocates is without merit. Further, defendant has failed to introduce, nor do I find any evidence that, despite the plain and unambiguous language, Congress intended the statute to be interpreted differently.

In fact, the only relevant evidence that defendant introduced regarding the interpretation of Section 1396u-2(b)(2)(D) is a letter from Dennis Smith, director of CMS. The letter states:

Prior to the enactment of [42 U.S.C. § 1396u-2(b)(2)(D)],

Page 26 - OPINION AND ORDER

> there was no Federal law or regulation governing the amount of payment for emergency services provided to Medicaid beneficiaries who received these services by a provider who did not have a contract with the beneficiary's Medicaid managed care entity.  There was often disputes over the rate at which the provider of emergency services would be paid. This legislation **establishes a limit on the amount that emergency services providers who do not have a Medicaid managed care contract can be paid by Medicaid managed care entities. . . .** This rule applies whether the non-contracting provider is within the State or outside of the State in which the managed care entity has a contract.

Letter from Dennis Smith, Director, Centers for Medicare & Medicaid Services, to state Medicaid Directors (March 31, 2006) (emphasis added).

This letter, however, merely confirms plaintiff's interpretation of the federal statute.  The letter expressly states that Section 1396u-2(b)(2)(D) "establishes a limit" on what an out-of-state non-participating hospital must accept as payment.  Thus, this letter establishes that in enacting the federal statute, Congress intended to set a limit, rather than establish a minimum payment amount, leaving the exact rates that a FCHP must pay non-contracted hospitals up to the states to determine, so long as those rates did not exceed what the state pays contracted FFS providers.

Moreover, this interpretation is congruous with the public policy surrounding Medicaid.  Medicaid makes it possible for certain qualified low-income individuals and families to receive health benefits that they otherwise could not afford.  See Overview of Medicaid Program, CMS Website, available at https://www.cms.gov/MedicaidGenInfo/.  In order to extend limited

resources to as many individuals in need as possible, Medicaid typically pays very low rates to providers. Id. However, defendant's interpretation of 42 U.S.C. § 1396u-2(b)(2)(D) defeats this policy.

Here, defendant charged plaintiff more than $50,000 per day for the initial 13 days of hospitalization. While hospital finance is a very complicated subject and administering a hospital is no doubt costly, this fee is at least a hundred times greater than the actual cost of the services provided. See Turnblow Decl., Ex. 7, Plf.'s Resp. to Def.'s Mot. Part. Summ. J. Under defendant's interpretation, plaintiff would be required to pay 60% of these charges, or approximately $700,000 more than it already has paid. Such payment would require plaintiff, as a Medicaid managed FCHP with limited resources, to expend a significant amount of its already inadequate funds on a relatively small amount of services. Thus, payment of 60% of the nearly $1.5 million of billed charges would work a substantial hardship on plaintiff, and would reduce the amount of coverage that plaintiff could provide to others in need, thereby contravening the public policy of providing as much care to as many people as possible.

Therefore, I find that OAR 410-120-1295 requires that a FCHP pay 80% of the Medicare rate for emergency services to a non-participating hospital, provided that such payment does not exceed the amount that the hospital could collect from DMAP if

Page 28 - OPINION AND ORDER

the patient received medical assistance other than through
enrollment in the FCHP.

Here, plaintiff paid $236,699.92. It is undisputed that
this amount equals 80% of the Medicare rate for the services
provided. Further, it is undisputed that this amount is "no more
than" the amount that defendant would have received through its
FFS contract with DMAP. 42 U.S.C. § 1396u-2(b)(2)(D).
Therefore, plaintiff's payment for emergency services was
"consistent with" Section 1396u-2(b)(2)(D).

Finally, it should be noted that even if the parties had not
entered into a series of implied contracts, reimbursement for the
disputed services would still be governed by OAR 410-120-1295.
Defendant argues that OAR 410-124-0000(9)(c) and OAR 410-124-
0040(2) govern this dispute in the absence of a contract.
Specifically, defendant asserts that OAR 410-124-0000(9)(c) and
OAR 410-124-0040(2) are more specific provisions, and thus, under
the rules of statutory interpretation, should instead apply.

As discussed in Section II(C), above, OAR 410-124-0000(9)(c)
and OAR 410-124-0040(2) govern payment for transplant services,
whereas OAR 410-120-1295 governs payment between a FCHP and a
non-participating hospital. The Administrative Rules do not
specify which provision governs where, as here, more than two
provisions could apply. The transplant rules, although arguably
more specific as to the nature of the services, are more general
in the sense that they apply to all assistance programs and

Page 29 - OPINION AND ORDER

related services. Conversely, OAR 410-120-1295, while part of
the general rule section of the regulations, governs a far more
specific subject matter: payments made by FCHPs to non-
participating hospitals in the absence of a contract. In
addition, other sections of the regulations specifically require
all Medicaid plans to pay "non-participating providers"
furnishing services to OHP members in accordance with OAR 410-
120-1295. See OAR 410-141-0420(6)(D). As a result, defendant's
contention that one provision is more specific, and thus,
applicable, than another, is inconclusive at best.

Further, OAR 410-124-0000(9)(c) only requires that the
parties enter into a contract for transplant services. It is
silent regarding the rate of payment in the absence of a
contract, and thus, would be of no assistance if the parties
truly did not have an agreement in place at the time services
were provided. As such, OAR 410-120-1295 would still govern
because it is the only provision that expressly addresses the
rate of payment where no contract exists.

Rule 410-124-0040(2) is somewhat more precise in what it
requires from a FCHP. The provision states that "FCHPs will make
payment as described in their contract." OAR 410-124-0040(2).
The term "their," however, is ambiguous, as it could refer to
either the FCHP's contract with DMAP or the FCHP's contract with
the transplant center. In either instance, however, the result
is identical. If "their" is construed as referring to a FCHP's

Page 30 - OPINION AND ORDER

contract with DMAP, as plaintiff advocates, then OAR 410-120-1295 would be applicable. See DCIPA-DMAP Contract, at pgs. 16 & 26. Conversely, if "their" is interpreted as referring to a FCHP's contract with the transplant center, and the parties failed to enter into a contract, then the default payment provision would apply. In this case, OAR 410-120-1295 is the default payment provision, as it explicitly governs reimbursement by a FCHP to a non-contracting hospital. Therefore, regardless of whether a contract was formed, the outcome would be the same, and defendant would be entitled to payment at 80% of the Medicare rate.

## C. Defendant's Alternative Arguments for Why 80% of the Medicare Rate Does Not Apply

Finally, defendant asserts that it is still not subject to 80% of the Medicare rate for one or more of the following reasons: 1) the rate was never approved by CMS to be part of the State Plan; 2) imposing the rate on defendant violates the Commerce Clause; and 3) defendant is not a party to the contract between DMAP and plaintiff, and thus, its terms cannot bind defendant. See Def.'s Reply to Mot. Part. Summ. J. 1-2.

Regarding defendant's first argument, if CMS approval was necessary, the statute and rules must be challenged before CMS, and may not be collaterally attacked. See Pharmaceutical Research and Mfrs. of America v. Walsh, 538 U.S. 644, 651 (2003) (challenges to a state Medicaid program, not approved by CMS, could not be heard by the District Court because an

Page 31 - OPINION AND ORDER

administrative proceeding was the exclusive remedy available for a lack of approval under the Social Security Act). More importantly, defendant has not presented enough evidence to overcome the presumption that all laws were appropriately enacted. Id. (citing to Davies Warehouse Co. v. Bowles, 321 U.S. 144, 153 (1944)("[s]tate statutes . . . are entitled to the presumption of constitutionality until their invalidity is judicially declared")). Instead, defendant merely speculates that the rate "does not appear to have been approved by CMS, and is thus arguably not valid at all." Def.'s Reply to Mot. Part. Summ. J. 10. Such an allegation, alone, is not sufficient to render the rate in question invalid, and, as such, defendant's first argument fails as a matter of law.

Defendant next contends that the rates present in OAR 410-120-1295 violate the Dormant Commerce Clause when applied to an out-of-state provider. This argument also fails as a matter of law. Where, as here, the parties enter into a private agreement for the payment of services at a certain rate, no constitutional Dormant Commerce Clause issues are raised. Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 440-1 (1978) (state action is required in order to implicate the Dormant Commerce Clause); see also Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown, 567 F.3d 521, 524 (9th Cir. 2009) (Dormant Commerce Clause is implicated only where state law regulates an activity that has a substantial effect on interstate commerce). As such, the terms of the parties' contract dictates their

Page 32 - OPINION AND ORDER

respective rights and duties.  A.P. Moller-Maersk v. Taiwan Glass USA Sales Corp., 663 F.Supp.2d 1011, 1015 (D.Or. 2009).  Because the parties formed a contract for "DMAP rates," defendant is bound to accept such rates.

Further, even if the parties had not formed a contract, it would be inappropriate on this record to decide whether the application of OAR 410-120-1295 to defendant would violate the Dormant Commerce Clause.  Defendant did not raise this issue in its partial motion for summary judgment nor was any evidence offered thereon.  Rather, defendant first asserted this argument in its reply to plaintiff's cross-motion for summary judgment and devoted a cursory four sentences to the issue.  See Def.'s Reply to Mot. Part. Summ. J. 11.  Plaintiff similarly did not brief the issue: "[n]ormally, we would not try to make a sur-reply argument in writing . . . [and] although we are not briefing [this] argument, we oppose [it]."  Plf.'s Corrected Reply to Mot. Summ. J. 33.  Accordingly, the record here is insufficient to determine whether the argument has any validity.

Regardless, because this Court has previously found that the parties did have a contract, the absence of briefing on the issue does not create a genuine issue of material fact that forecloses summary judgment.  It should, however, be noted that the Dormant Commerce Clause requires only that state laws not discriminate against out-of-state commerce.  H. P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 531-532 (1949).  Thus, OAR 410-120-1295 is

presumably valid as applied to defendant so long as the regulation applies equally to in-state and out-of-state providers. Id. (state legislation that is designed to serve legitimate state interests and applied without discrimination against interstate commerce does not violate the Commerce Clause even though it affects commerce).

Finally, defendant's third assertion fails. At no point during this dispute has either party alleged that defendant is bound by plaintiff's contract with DMAP. Rather, as discussed in detail in Section III(A), above, the parties entered into a series of independent contracts, wherein the payment for services was determined by reference to the rates present in plaintiff's contract with DMAP. However, this is in no way equivalent to defendant being a third-party beneficiary to the contract between plaintiff and DMAP.

Accordingly, this Court grants plaintiff's motion for summary judgment in regard to its declaratory judgment claim, and denies defendant's motion for partial summary judgment. Therefore, as a matter of law, plaintiff has fulfilled its financial obligation to defendant by paying $236,699.92, representing 80% of the Medicare rate, for the services in dispute.

## IV. Defendant's Affirmative Defenses and Counterclaims

Plaintiff also moves for summary judgment on all of

Page 34 - OPINION AND ORDER

defendant's affirmative defenses and counterclaims.

## A.   Defendant's Affirmative Defenses

Defendant alleges the following affirmative defenses: 1) failure to state a cause of action; 2) failure to state a cause of action for declaratory relief; 3) relief barred by the allegations of the counterclaim; 4) failure to do equity; 5) unclean hands; and 6) reservation of additional defenses. See Def.'s Am. Answer, Affirm. Defenses & Countercls. 3-4.

Defendant's first and second affirmative defenses relate to plaintiff's alleged failure to state a claim. Defendant's third affirmative defense states that plaintiff is not entitled to the declaration it seeks because defendant is entitled to more money under its counterclaims. Defendant's first, second, and third affirmative defense are dismissed, since, as a matter of law, this Court finds that plaintiff properly stated a claim for, and is entitled to, a declaratory judgment.

Additionally, defendant's fourth and fifth affirmative defenses fail as a matter of law. Both defenses are equitable in nature and based upon plaintiff's alleged obligation to negotiate in good faith with defendant to reach an agreement regarding the reimbursement rate. Essentially, defendant is arguing that plaintiff cannot obtain declaratory relief because it refused defendant's demands to settle this dispute by agreeing to pay some rate greater than what the Court found the parties agreed to

Page 35 - OPINION AND ORDER

and what the law requires. However, because defendant was only entitled to 80% of the Medicare rate, plaintiff did not violate any obligation by refusing to pay more than that rate.

Finally, defendant's sixth affirmative defense, in which it purports to reserve the right to assert additional affirmative defenses, is dismissed. Defendant's "reservation" has no basis in law. Therefore, plaintiff's motion for partial summary judgment is granted in regard to defendant's affirmative defenses.

## B.   Defendant's Counterclaims

Defendant also asserts the following counterclaims: 1) declaratory relief; 2) breach of implied-in-law contract/quantum meruit; 3) breach of implied-in-fact contract; 4) equitable estoppel; 5) open book account; 6) account stated; 7) private right of action for violation of OAR 410-124-0000(9)(c) and OAR 410-124-0040(1), (2); and 8) private right of action for violation of OAR 410-120-1295. See Def.'s Am. Answer, Affirm. Defenses & Countercls. 9-17. All of defendant's counterclaims are based upon plaintiff's choice to pay in accordance with the parties' implied contract and to follow OAR 410-120-1295, rather than to negotiate payment for a larger amount for the disputed services.

### i.   First Counterclaim

Defendant's first counterclaim seeks a declaratory judgment

Page 36 - OPINION AND ORDER

that plaintiff is obligated to pay the "reasonable value" of its services because plaintiff failed to negotiate in good faith a contract or agreement for the payment of services. However, as discussed in Section III(A), above, the parties successfully formed a contract for the payment of services. Further, plaintiff provided compensation to defendant in accordance with the parties' contract and governing law. Thus, plaintiff cannot now be required to pay more simply because, after this dispute arose, plaintiff refused to enter into a different agreement to pay defendant a greater amount.

### ii. Second Counterclaim

Defendant's second counterclaim again seeks the "reasonable value" of its services under the theory of quantum meruit. Defendant relies in two cases from outside of this district in support of its claim. See Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alts., Inc., 832 A.2d 501 (Penn.Sup. 2003); River Park Hosp., Inc. v. Bluecross Blueshield of Tenn., Inc., 173 S.W.3d 43 (Tenn.App. 2002).

Defendant's second claim, however, also fails as a matter of law. Quantum meruit is an obligation created by law without regard to the intention of the parties in situations in which one person is accountable to another on the grounds that otherwise he would unjustly benefit or the other would unjustly suffer loss. Verizon Northwest, Inc. v. Main Street Dev., Inc., 693 F.Supp.2d 1265, 1275 (D.Or. 2010) (applying Oregon law). The elements of

Page 37 - OPINION AND ORDER

the claim are a benefit conferred, awareness by the recipient
that a benefit has been received, and judicial recognition that,
under the circumstances, it would be unjust to allow retention of
the benefit without requiring the recipient to pay for it.  Id.
However, where the parties have entered into an actual agreement,
whether express or implied, a claim for unjust enrichment cannot
lie.  See Ken Hood Constr., 203 Or. App. at 772 ("if the parties
have a valid contract, any remedies for breach flow from that
contract, and a party cannot recover quantum meruit for matters
covered by the contract") (emphasis in original); see also
Kashmir v. Patterson, 289 Or. 589, 594, 616 P.2d 468 (1980) (if
defendant admits to the existence of a contract, an alternative
claim for quantum meruit must be stricken).

As discussed in Section III(A), above, the parties had an
implied contract in place for the payment of services.
Therefore, a claim for unjust enrichment cannot lie and the terms
of the contract govern any dispute regarding payment.  Ken Hood
Constr., 203 Or. App. at 772.  As such, the cases relied on by
defendant, both involving situations in which no express or
implied agreement existed, are not applicable here.  See Temple
Univ. Hosp., 832 A.2d 501; River Park Hosp., 173 S.W.3d 43.

Moreover, defendant acknowledges that the Emergency Medical
Treatment and Active Labor Act ("EMTALA") requires it to provide
emergency services without regard to payment.  See Def.'s Resp.
to Plf.'s Mot. Summ. J. 24.  As such, defendant would have had to

Page 38 - OPINION AND ORDER

provide the transplant whether it received 100% of its billed charges, 80% of the Medicare rate, or nothing at all. Thus, it is curious that, after having been paid a substantial sum in accordance with the parties' contract and the applicable regulations, defendant now contends that this amount is unreasonable and, as such, it is entitled to greater compensation. Regardless, I find, as a matter of law, that payment of an amount required by both contract and law cannot be inequitable, and, as such, cannot support a claim for unjust enrichment. As such, defendant's second counterclaim is dismissed.

### iii. Third Counterclaim

Defendant's third counterclaim alleges that the plaintiff entered into an implied-in-fact agreement to pay the "reasonable value" of the services in dispute. Defendant bases its claim on the allegations that it is "custom and practice in the healthcare industry" for FCHPs to pay the "reasonable value" of services, plaintiff knew of this custom when it authorized transplant and related services, and plaintiff breached this implied contract by paying less than an undisclosed "reasonable" rate. See Def.'s Am. Answer, Affirm. Defenses & Countercls. 11-12.

However, defendant's claim contravenes the law and facts in this case. As discussed above, the parties did enter into implied contracts for the provision of services. Contrary to defendant's assertions, these contracts dictated that payment

Page 39 - OPINION AND ORDER

equal "DMAP rates" and not the "reasonable value" of the services provided. Moreover, independent of this Court's findings in Section III(A), defendant has failed to introduce evidence of any communications or conduct establishing an agreement for the "reasonable value" of services, or that payment at such a rate is, in fact, the standard "custom and practice in the healthcare industry." Consequently, defendant's counterclaim for breach of implied-in-fact contract for the "reasonable value" of services also fails as a matter of law and is dismissed.

### iv. Fourth Counterclaim

Defendant's fourth counterclaim is for equitable estoppel. The doctrine of equitable estoppel provides that "a person may be precluded by his act or conduct, or silence when it was his duty to speak, from asserting a right which he otherwise would have had." Lydian Wealth Mgmt. Co., LLC v. Jacob, 2007 WL 4964427, at *9 (D.Or. 2007) (quoting Marshall v. Wilson, 175 Or. 506, 518, 154 P.2d 547 (1944)).

Equitable estoppel is not a cause of action, entitling a party to money damages; rather, it is a defense. Marshall, 175 Or. at 514 ("estoppel is not a cause of action"). In Oregon, there are five elements that must be satisfied for the doctrine to apply: (1) a false representation; (2) made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) made with the intention that it should be acted upon by the other party; (5) the other party must have been induced to

Page 40 - OPINION AND ORDER

act upon it.  Day v. Advanced M & D Sales, Inc., 336 Or. 511,
519, 86 P.3d 678 (2004).

Here, defendant has failed to allege a prima facie case for
equitable estoppel.  Defendant alleges that plaintiff knew that
it was required to pay the "reasonable value" of the services
provided, yet only ever intended to pay 80% of the Medicare rate,
and failed to disclose this fact to defendant.  Yet defendant
acknowledges that in plaintiff's June 25, 2009 letter, plaintiff
stated "that it would pay at the 80 percent of the Medicare
rate."  Def.'s Memo. in Support of Mot. Part. Summ. J. 9-10.
Further, this Court has determined that 80% of the Medicare rate
is the proper reimbursement for the disputed services.  Thus,
defendant's contentions that plaintiff made a false
representation that it was only required to pay for services at
80% of the Medicare rate, or failed to disclose its intention to
pay at such a rate, are unfounded.  As such, defendant failed to
allege all the elements of its claim.

Moreover, even if defendant could establish a
misrepresentation, it could not establish detrimental reliance or
that such reliance was reasonable.  See Day, 336 Or. at 519.
Defendant failed to introduce any evidence that, absent
plaintiff's alleged misrepresentation, it would have taken
different action entitling it to more money, especially since
defendant was legally required under EMTALA to provide the
transplant without regard to the payment.  See Def.'s Resp. to

Page 41 - OPINION AND ORDER

Plf.'s Mot. Summ. J. 24. As such, defendant failed to establish a prima facie case for equitable estoppel. See Day, 336 Or. at 519. Defendant's fourth counterclaim fails as a matter of law and is dismissed.

### v. Fifth Counterclaim

Defendant's fifth counterclaim also fails as a matter of law. The basis of this claim in unclear, but seems to be that, because defendant kept an ongoing account of "billed charges" and plaintiff has failed to pay all of these charges, defendant is entitled to additional compensation for the outstanding amount on the account. As this Court has previously stated, plaintiff has fulfilled its financial obligation to defendant in accordance with the parties' contract and the relevant regulations.

Further, keeping a record of the amount one seeks in a dispute is not sufficient to state a prima facie claim. See Gardner & Beedon Co. of Springfield v. Cooke, 267 Or. 7, 9-10, 513 P.2d 758 (1973) ("in an action on an open account the account is not self-proving. Some testimony is required tending to prove its correctness and the fact that it is due and owing"); see also Northwest Country Place, Inc. v. NCS Healthcare of Or., Inc., 201 Or. App. 448, 460, 119 P.3d 272 (2005) (party asserting a claim on an "open account" is "obligated to prove (1) a valid contract between the parties; (2) an amount outstanding on the account; and (3) the amount outstanding is correct under the contract or otherwise reasonable").

Page 42 - OPINION AND ORDER

Here, defendant has not introduced any evidence that there
is an amount outstanding on the parties' contract for "DMAP
rates" or that the amount defendant alleged to be outstanding is
"correct under the contract or otherwise reasonable" under the
circumstances. Northwest, 201 Or. App. at 460. Therefore, as a
matter of law, and despite defendant's assertions to the
contrary, plaintiff cannot be "indebted [to defendant] in an
amount equal to the amount set forth in the book account for
transplant services," especially since this amount expressly
contradicts 42 U.S.C. 13(d)(u), which limits the amount that a
non-participating hospital may demand as payment to the amount
set forth in its FFS contract with DMAP. Def. Am. Answer,
Affirm. Defenses & Countercls. 13. As such, defendant's fifth
claim is dismissed.

## vi. Sixth Counterclaim

Additionally, defendant's sixth counterclaim is dismissed.
Defendant's sixth counterclaim is analogous to its fifth.  The
legal basis of plaintiff's sixth counterclaim is for an "account
stated."  Defendant again alleges that because it kept an account
of "billed charges," and plaintiff has not paid all of those
charges, it is entitled to additional compensation for the
outstanding amount of the account.  In order to prevail on such a
claim, a creditor must prove that the account debtor, by words or
actions, admitted or agreed that the amount claimed by the
creditor in a billing or other statement of the accounting was

Page 43 - OPINION AND ORDER

correct.  See Hulse v. Ocwen Bank, FSB, 195 F.Supp.2d 1188, 1201
(D.Or. 2002) ("[i]t is necessary for a plaintiff claiming an
account stated to establish an agreement to pay a particular
amount of money"); see also Cooley v. Roman, 34 Or. App. 301,
305, 578 P.2d 491 (1980) (rejecting a claim for account stated
because the defendant "claimed he was not liable for some of the
charges upon which plaintiff was suing").

     Here, since plaintiff is disputing liability for the charges
upon which defendant is basing its counterclaim, and defendant
has not alleged any conduct by plaintiff that could be
interpreted to be an admission or agreement that the amount the
defendant claimed was actually due, especially in light of the
parties' implied contract for "DMAP rates," there can be no
agreement fixing the amount due.  Accordingly, defendant's sixth
counterclaim fails as a matter of law.

### vii.  Seventh Counterclaim

     Defendant's next counterclaim is a private right of action
based on plaintiff's alleged violation of OAR 410-124-0000(9)(c)
and OAR 410-124-0040(1), (2).  As discussed above, OAR 410-124-
0000(9)(c) pertains to transplant services generally, and states
that reimbursement by FCHPs for transplant services "will be by
agreement between the FCHP and the transplant center."  OAR 410-
124-0000(9)(c).  Defendant alleges that because plaintiff failed
to negotiate a contract in good faith, it violated OAR 410-124-
0000(9)(c).  Defendant also alleges that plaintiff breached its

Page 44 - OPINION AND ORDER

contract with DMAP by failing to provide an adequate network of providers.

Here, however, the parties did negotiate a contract for the payment of services at "DMAP rates." Therefore, in accordance with OAR 410-124-0000(9)(c), reimbursement for the provision of transplant services was "by agreement between the FCHP and the transplant center." Id. As such, defendant has failed to allege any violation of law or regulation.

Further, defendant's assertions regarding plaintiff's alleged breach of its contract with DMAP are unfounded. It is undisputed that plaintiff is required to maintain an adequate panel of contracted providers, including at least one hospital. See OAR 410-141-0160(1)(d)(A) (requiring plans to maintain a "referral system") and OAR 410-141-0220 (generally describing "access" requirements). However, the fact that the state has approved plaintiff's provider panel each year is evidence of compliance with the relevant provisions. See Plf.s Corrected Reply to Mot. Summ. J. 15. Accordingly, defendant's seventh counterclaim fails as a matter of law.

### viii. Eighth Counterclaim

Finally, defendant's eighth counterclaim, in which it seeks redress via a private right of action for plaintiff's alleged violation of OAR 410-120-1295, is dismissed. Because this Court interprets OAR 410-120-1295 as requiring reimbursement by a FCHP

to a non-participating hospital at 80% of the Medicare rate, defendant cannot, as a matter of law, sustain a claim for violation of this provision for payments made by plaintiff in express accordance with it.

Therefore, defendant's affirmative defenses and counterclaims fail as a matter of law, and as such, are dismissed.

## V. Remaining Issues

The only remaining issues are plaintiff's claim for refunds of overpayments and attorney fees, plaintiff's combined discovery motions, and defendant's motion for protective order regarding plaintiff's requests for admissions and for sanctions.

### A. Plaintiff's Claims for Refunds of Overpayments and Attorney Fees

The resolution of plaintiff's claims for refunds of overpayments and attorney fees are not directly before this Court, because defendant did not move for summary judgment on these claims. However, the Court makes a preliminary finding that there are no issues remaining for resolution in this dispute.

### B. Plaintiff's Combined Discovery Motions and Defendant's Motion for Protective Order

In addition to its motion for partial summary judgment,

plaintiff filed a combined motion to compel and to answer
interrogatories.  I find that the majority of plaintiff's motions
are now rendered moot by this Court's resolution of the parties'
cross-motions for summary judgment.  Further, defendant's motion
for a protective order on plaintiff's second set of requests for
admissions is also rendered moot for the same reason.  Thus, in
light of this Court's preliminary finding and the resolution of
the parties' motions for summary judgment, I find that it is
necessary to stay these motions, at least until after the parties
have had a chance to confer regarding this Opinion.

## CONCLUSION

Plaintiff's motion for summary judgment (doc. 56) is
GRANTED.  Defendant's motion for partial summary judgment (doc.
46) is DENIED.

Additionally, plaintiff's combined discovery motions (doc.
53) and defendant's motion for protective order regarding
plaintiff's requests for admissions and for sanctions (doc. 78)
are stayed until after the parties have had a chance to confer
regarding this Opinion.  If, after conferring, one or both
parties chooses to renew a motion, it must amend and re-file or
otherwise notify the Court.

Finally, the parties' requests for oral argument are DENIED
as unnecessary.  The Court strongly encourages the parties to
pursue settlement of this matter in light of these proceedings

and the Court's preliminary finding.  The Court can arrange a
judicial settlement conference if the parties are interested.

IT IS SO ORDERED.

Dated this 20th of October, 2011.

Ann Aiken
United States District Judge